## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-3466

H.N. *ex rel.* A.N., a minor,

    Plaintiff,

v.

NICHOLAS WEIMAN,
RICHARD NORTON,
CITY AND COUNTY OF BROOMFIELD,

    Defendants.

---

### CIVIL RIGHTS COMPLAINT AND JURY DEMAND

---

Plaintiff, H.N., *ex rel* A.N., by and through his attorney, Zachary Warren of HIGHLANDS LAW FIRM, hereby brings this Complaint and Jury Demand against Nicholas Weiman, Richard Norton, and the City and County of Broomfield ("Broomfield") (each a "Defendant" and, together, the "Defendants"), and alleges the following:

### I. INTRODUCTION

1.    A.N. is a 15-year-old female diagnosed with numerous and severe disabilities caused by Fibrodysplasia Ossificans Progressiva ("FOP"), a very rare disorder in which soft tissue—such as muscles, tendons, and ligaments—are gradually replaced by bone. As the disease progresses, individuals with FOP develop significant extra-skeletal or heterotopic bone, usually starting in the neck and shoulders, that severely constrains movement. FOP also causes extreme sensitivity to touch. As a result, certain forms of physical contact that may seem innocuous (*e.g.*, a superficial scrape on the skin) can cause excruciating pain for someone with FOP.

2. On the morning of December 10, 2017, A.N. had a friend at her house, and they got into a disagreement. During the course of the disagreement, A.N. suffered a very minor abrasion on her arm—a red mark but nothing more. Because the friend was aware of A.N.'s condition, however, she knew that even a minor injury could result in serious harm to A.N., so she called 9-1-1 and requested medical assistance to ensure that A.N. was okay.

3. Defendant Weiman, an officer with the Broomfield Police Department, was dispatched to the scene. When he arrived, *and despite the fact that A.N.'s friend called 9-1-1 solely to obtain medical assistance on behalf of A.N*., Defendant Weiman proceeded to arrest A.N., place her in metal handcuffs, and take her away. At the time he handcuffed A.N., Defendant Weiman was aware that A.N. suffered from severe disabilities and that the application of metal handcuffs was certain to cause A.N. significant pain.

4. But it gets worse.

5. Before booking A.N. into the juvenile detention facility, Defendant Weiman was instructed to obtain medical clearance because of A.N.'s known severe disabilities. As a result, Defendant Weiman transported A.N. to the hospital. When they arrived at the hospital, medical staff were requested to conduct a physical examination of A.N., beginning with the abrasion on her arm. Medical staff attempted to lift A.N.'s arm for examination, but A.N. informed them that she was incapable of lifting her arm because of her limited range of motion. Despite this warning, medical staff again attempted to lift her arm, causing A.N. to recoil from the severe pain—an involuntary and desperate attempt to protect herself from further harm.

6. Defendant Weiman viewed this attempt to protect herself as "combative" behavior and then forcibly restrained A.N. by holding her down on the examination table. At this point, Defendant Norton, another officer with the Broomfield Police Department, joined Defendant Weiman in the forcible restraint. While Defendant Weiman pinned A.N. to the examination table, **Defendant Norton**

*attached a leg hobble to A.N.—binding her legs together—and then connected the leg hobble to her handcuffs*, forcing her into a seated position.

7. Defendants Weiman and Norton then lifted A.N. off the exam table and placed her in a wheelchair. To accomplish the transfer, Defendant Weiman grabbed hold of A.N.'s right arm, torqueing the arm above her shoulders and far beyond her normal range of motion, causing her severe pain. Defendants Weiman and Norton then proceeded to lift her again—A.N. screaming all the while—from the wheelchair into the patrol car where A.N. fell sideways against the metal cage partition, impacting her neck and head. Because of her limited range of motion and mobility, A.N. remained wedged against the metal cage for the duration of her transport to the juvenile detention facility.

8. A.N. suffered severe injuries as a result of this unnecessary and aggressive treatment. According to medical records, subsequent to this use of force, A.N. has new bony growths throughout her right chest wall, right shoulder/scapula areas, and wrists, further restricting her already limited range of motion. Similarly, as a result of this incident, A.N. has increased curvature of the spine, increased "pelvic tilt," a new "dystrophic band-like calcification" along the upper chest wall, and she is unable to lift her head up straight—it remains fixed at a downward angle at all times. The functional result is that A.N., following this incident, now needs help eating, getting dressed, and going to the bathroom, along with numerous other activities of daily living.

9. To make matters even worse, senior-level decision-makers at Broomfield subsequently ratified the actions of Defendants Weiman and Norton—including the decision to place handcuffs on a severely disabled child knowing it would cause severe pain and the subsequent decision to use a leg hobble against a disabled child in severe pain. At all relevant times, the officers were aware that A.N. had severe disabilities and the fact that their actions were certain to inflict harm on her. Nevertheless, and despite numerous explicit requests for accommodations by H.N. and A.N., as described in more detail below, the officers instead chose to forcibly restrain A.N. Taken together, these facts demonstrate

an abject failure to adequately train and supervise officers in the Broomfield Police Department regarding interactions with individuals with disabilities, and particularly children who pose no threat to officers, the public, or themselves.

## II.  JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States, including, 42 U.S.C. § 1983, 1988, the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.*, as amended, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 701, *et seq.*, over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11. Venue is proper within the District of Colorado pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to the claims in this matter occurred within the District of Colorado.

## III.  PARTIES

12. At all times relevant to this action, Plaintiff H.N. was an adult resident of the State of Colorado and citizen of the United States. Plaintiff H.N. is the natural father of A.N. and brings this action on her behalf.[1]

13. At all times relevant to this action, Plaintiff A.N. was a minor child resident of the State of Colorado and citizen of the United States, who lives with H.N. at their home in Broomfield, Colorado. At all times relevant to this action, A.N. was a person with disabilities as that term is defined in both Section 504 and the ADA.

14. At all times relevant to this action, Defendant Nicholas Weiman was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a law enforcement officer with Broomfield Police Department.

---

[1] The Plaintiff in this matter will soon file a Motion seeking leave of Court to proceed throughout this litigation using a pseudonym for himself and A.N., his minor child, pursuant to Fed. R. Civ. Pro. 5.2(a) and related authority.

15. At all times relevant to this action, Defendant Richard Norton was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a law enforcement officer with Broomfield Police Department.

16. Broomfield is a consolidated city and county in the State of Colorado, which operates under Article XX, Sections 10-13 of the Constitution of the State of Colorado. The Broomfield Police Department is a department of Broomfield. At all times relevant to this matter, officers and personnel of the Broomfield Police Department were acting as agents of Broomfield under color of state law.

## IV. FACTUAL ALLEGATIONS

17. A.N. was diagnosed with FOP at a very young age when her parents and medical providers recognized developmental abnormalities in her hands and feet—a characteristic feature of FOP that helps to distinguish this particular disorder from other bone and muscle problems.

18. The National Institute of Health describes the progression of FOP, for which there is no known cure, as follows:

> Extra-skeletal bone formation causes progressive loss of mobility as the joints become affected. Inability to fully open the mouth may cause difficulty in speaking and eating. Over time, people with this disorder may experience malnutrition due to their eating problems. They may also have breathing difficulties as a result of extra bone formation around the rib cage that restricts expansion of the lungs.
>
> Any trauma to the muscles of an individual with fibrodysplasia ossificans progressive, such as a fall or invasive medical procedures, may trigger episodes of muscle swelling and inflammation (myositis) followed by more rapid ossification in the injured area.[2]

19. Additionally, any trauma to the soft tissue of an individual with FOP can cause searing pain—even seemingly insignificant or superficial trauma which would ordinarily not affect someone without the condition.

---

[2] Additional information available at https://ghr.nlm.nih.gov/condition/fibrodysplasia-ossificans-progressiva#

5

20. Over time, the extra-skeletal bone formation may the joints of individuals, and severely limit mobility throughout the body as pictured below:



21. For most individuals living with FOP of adolescent age or older, it is obvious that they have a disability to anyone who might observe them—it does not take any specific training or education to identify that the individual with FOP has extra-skeletal bone formation and serious disabilities.

22. A.N. presents with all of the tell-tale signs of FOP, including, without limitation, developmental irregularities in her hands and feet; pronounced and obvious extra-skeletal bone formation in her neck, shoulders, and back; severe spinal curvature and "pelvic tilt"; an inability to ambulate with a regular gait; and an obvious lack of mobility and dexterity in her neck, shoulders, back, and extremities.

23. On December 10, 2017, A.N. invited a friend, a female minor of approximately the same age, over to her house to spend time together. While they were spending time together, they had a minor dispute, during which the friend snatched a backpack away from A.N., leaving A.N. with a seemingly superficial abrasion on her arm.

24. However, since A.N.'s friend was aware of her diagnosis and no adults were present at the home, the friend dialed 9-1-1 and requested medical assistance.

25. The dispatch records specifically note that the call-for-service was interpreted as a call for medical assistance. The caller, according to dispatch records, "says she hurt her friend's arm" and the "arm is red and swollen" as a result.

26. Following this call, an ambulance and a patrol car responded to the scene—the patrol car operated by Defendant Weiman.

27. Defendant Weiman got out of his vehicle and approached A.N.'s home. Her friend opened the door for him and allowed him inside.

28. The friend informed Defendant Weiman that she had inadvertently hurt A.N.'s arm and led him to A.N.'s bedroom where she was lying on the bed.

29. At this time, the friend directly informed Defendant Weiman of A.N.'s condition—including the fact that she "has a disorder that causes her muscles to calcify and turn into a bone like substance," according to Defendant Weiman's own report.

30. The friend also directly informed Defendant Weiman that "[t]his disorder supposedly makes normal contact and movement painful for [A.N.]."

31. At this point, Defendant Weiman noticed a red mark on the friend's ear and began asking questions about the disagreement between herself and A.N., and then followed-up with A.N. directly about the disagreement.

32. Defendant Weiman noted that during questioning "[A.N.] continued to look straight down and didn't appear to be engaged with what was happening around her[]" and that "[w]hile EMS crews were questioning [A.N.] I observed that she was looking down and not answering their questions."

33. Throughout this process, Defendant Weiman viewed A.N.'s conduct as evasive or incriminating whereas the reality is that A.N. was incapable of actually looking directly ahead and making eye contact during questioning. As A.N.'s treating physician, a specialist at Children's Hospital, later stated: "She is NOT ABLE TO LIFT UP HER HEAD – this is not a volitional act or indicative of resisting arrest – she just cannot move her neck!"

34. While EMS responders and Defendant Weiman were questioning A.N. and her friend, H.N. arrived at the home.

35. When H.N. arrived at home, he spoke with Defendant Weiman, and Defendant Weiman informed H.N. that he intended to arrest A.N. for hurting her friend—the very friend who called for medical help on behalf of A.N. in the first place.

36. In response, H.N. provided information to Defendant Weiman about A.N.'s disorder. Among other things, H.N. did the following:

   a. Reaffirmed to Defendant Weiman that A.N. had a "very serious bone disease" that meant she could not bend her neck, back, shoulders, arms, and hands in a normal manner;

   b. Told Defendant Weiman that applying handcuffs—in any fashion, front or back—would cause A.N. excruciating pain.

   c. Informed Defendant Weiman that A.N. was incapable of walking without specialized shoes that accommodated the developmental malformations in her feet;

   d. Specifically reaffirmed that her shoulders had extremely limited range of motion such that she could not raise her arms;

   e. Provided Defendant Weiman with a business card that had the contact information for A.N.'s specialist at Children's Hospital, which showed that she works in the "Special Care Clinic"; and

   f. Pleaded with Defendant Weiman to not handcuff A.N. or use any other mechanical restraints against her.

37. At the same time, A.N. pleaded with Defendant Weiman to avoid handcuffing her because of her disease.

38. Nevertheless, Defendant Weiman applied the metal handcuffs, and then placed A.N. in the back of the patrol car.

39. After he placed the handcuffs on A.N., she told him that they were very painful and far too tight, but he refused to loosen them, utilize a different form of restraint, or simply place her in the back of the patrol car without any restraints.

40. Notably, throughout this process, Defendant Weiman noted in his own reports that A.N. conducted herself "without incident" and was "compliant with staff" when she arrived at the Broomfield Detention Center for booking.

41. Throughout this hours-long process, A.N. was handcuffed at all times, despite her protestations and explicit pleas to remove or loosen the handcuffs.

42. Before taking A.N. to the Adams Youth Services Center, where she would be incarcerated, Defendant Weiman was instructed to get a medical clearance for A.N. owing to her known serious disabilities.

43. Defendant Weiman then diverted to St. Anthony's North Health Campus in Westminster, Colorado, to obtain the medical clearance.

44. Upon arrival, A.N. was escorted from the patrol unit and processed into the Emergency Department, where she waited to be seen until approximately 5:12 p.m. At this point, A.N. had been in handcuffs for approximately four consecutive hours, including while she was waiting alongside Defendant Weiman in a secure and private hospital room within the Emergency Department.

45. Again, despite her pleas, Defendant Weiman refused to remove the painful handcuffs throughout this period of time.

46. When medical staff arrived to complete the evaluation, Defendant Weiman removed the handcuffs, and staff began asking a very brief series of questions about how A.N. sustained the scratch mark on her arm.

47. One of the medical providers then reached in to lift up A.N.'s arm to more closely inspect the scratch mark. A.N. informed her, clearly and unequivocally, that physically raising her arm in that manner was painful—that her arm could not reach upwards because of her disability.

48. The medical provider exclaimed that A.N. did not have a say in the matter—that she was required to submit to an examination because she had been arrested.

49. When the medical provider reached back towards A.N.'s arm a second time, fearing that she would be hurt again, she recoiled from the medical provider, swinging her arms away and contorting her body to protect herself.

50. Viewing this action as "combative," according to his reports, Defendant Weiman then abruptly decided to grab both of A.N.'s wrists, force them together, and then reapply the metal handcuffs.

51. The forcible restraint caused searing and unrelenting pain to A.N.'s hands, wrist, shoulders, neck, and back, as she squirmed helplessly on the examination table.

52. At no point during this exchange was A.N. attempting to hit, kick, threaten, or harm anyone in the room.

53. Defendant Weiman noted in his own report that "[A.N.] continually screamed that we were hurting her and ingorned my orders . . ." and that "her wrists and stomach were becoming red from her struggles."

54. At this point, Defendant Norton, who happened to be at the hospital at this time, jumped in to help forcibly restrain A.N.

55. Again, based on even a cursory glance, Defendant Norton was aware or should have been aware that A.N. was severely disabled, incapable of inflicting harm on himself or Defendant Weiman, and experiencing excruciating pain as evidenced by her screaming, crying, and begging to be let free from the forcible restraint.

56. Neverthless, while Defendant Weiman restrained A.N.'s upper body by pinning her to the examination table, Defendant Norton proceeded to apply a leg hobble to A.N. just above her knees—first cinching down the hobble with both hands and then securing the hobble to the handcuffs. While he was performing this maneuver, A.N. was screaming in pain, and pleading: "I just want to go home!"

57. Once the leg hobble was cinched down, Defendant Weiman grabbed A.N. by her right forearm—just above the handcuff securing her right wrist—and hefted her up, torqueing her arm high above her shoulders. Because of A.N.'s calcifications in this area, her normal range of motion does not allow her elbow to move forward more than just a few inches from a relaxed standing position. As a result, the amount of force necessary to wrench her arm above her shoulders was extraordinary and extremely painful for A.N., leaving her with the impression that her shoulder was dislocated.

58. While Defendant Weiman pulled on her arms, Defendant Norton forcibly grabbed her ankles, and then placed her in a wheelchair.

59. Both Defendant Weiman and Norton continued to apply unnecessary pressure to A.N. as she was taken by wheelchair to the patrol unit waiting outside.

60. Once they arrived at the patrol unit, Defendants Weiman and Norton again hefted A.N. out of the chair—again torqueing her arms above her shoulders while holding on to her feet—and abruptly and carelessly placed her in the back of the patrol unit.

61. Because of the unnecessary and abrupt manner in which they placed A.N. in the back of the patrol unit, A.N. was unable to maintain her balance or catch herself as she slammed against the

metal partition in the back seat. She hit the metal partition head-first and remained wedged against the partition at an angle—handcuffed and unable to lift herself up.

62. She remained in this position, her head wedged against the metal cage with her neck and back forced into an unnatural and painful position, for the duration of her transport to the Adams Youth Services Center.

63. Subsequent to this incident, Defendant Weiman submitted detailed reports, describing the fact that he had actual knowledge of A.N.'s severe disabilities, the fact that he unnecessarily utilized metal handcuffs against a "compliant" and non-combative disabled child, and the fact that he actively participated in applying and maintaining a leg hobble against a severely disabled child who was in the throes of excruciating pain.

64. The decision-makers and superior officers who reviewed this incident and the associated reports not only failed to discipline Defendant Weiman—they endorsed his conduct and ratified his actions as though they were entirely consistent with the policies, procedures, and actual practices of the Broomfield Police Department.

65. Throughout the course of this horrific ordeal, Broomfield made no modifications to its policies, procedures, or actual practices to accommodate the Plaintiffs during this interaction, despite the fact that the responding officers either knew that A.N. was a qualified individual for the purposes of the ADA, Section 504, and related statutes and regulations, or otherwise regarded A.N. as disabled under the same statutory provisions and regulations.

66. Reasonable modifications to Broomfield's policies, procedures, and actual practices relative to individuals with disabilities were available at all times relevant to this action, and are easily-implemented, cost-effective, require only minimal training, and would have avoided the damages identified in this Civil Rights Complaint and Jury Demand.

67. Such reasonable modifications include, without limitation, adequate training regarding the use of force against disabled children, modifying protocols to avoid the unnecessary use of force against disabled children, and ensuring that properly-trained officers are dispatched to calls for service involving individuals who are known or suspected to have disabilities.

68. There were no exigent or countervailing concerns that would excuse Broomfield from making reasonable modifications to its policies, procedures, and actual practices relative to the use of force inflicted upon A.N.

69. Broomfield engaged in the discriminatory practices described herein intentionally or with reckless indifference to the A.N.'s well-established rights.

70. Broomfield's policies, procedures, or actual practices of discriminating against individuals with disabilities, and specifically disabled children who pose no threat whatsoever to the involved officers, public, or themselves, were the moving force behind the responding officers' conduct and the cause of the A.N.'s injuries.

## V. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Excessive Force**
**Violations of the 4th Amendment**
(Plaintiff Against Defendants Weiman and Norton)

71. Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth fully herein.

72. 42 U.S.C. § 1983 provides:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

73. Defendants Weiman and Norton are persons for purposes of 42 U.S.C. § 1983.

74. Defendants Weiman and Norton, at all times relevant to this action, were acting under the color of state law in their respective capacity as a Broomfield police officer, and their acts and/or omissions were conducted within the scope of their official duties and employment.

75. At the time of the complained of events, A.N. had a clearly established constitutional right under the Fourth Amendment to be secure in her person from unreasonable seizure through excessive force by law enforcement.

76. Any reasonable police officer knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

77. Defendants Weiman and Norton engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting them thereby violating A.N.'s Fourth Amendment right to be free from excessive force.

78. First, it was not objectively reasonable for Defendant Weiman to utilize metal handcuffs to restrain A.N. for numerous reasons, including, without limitation:

   a. Defendant Weiman was aware that the application of metal handcuffs was certain to cause A.N. severe and atypical pain due to her disabilities;

   b. Defendant Weiman was aware that A.N. lacked the range of motion in her shoulders and arms to endure the handcuffs for any significant length of time, regardless of whether she was handcuffed with her hands in the front or the back;

   c. Defendant Weiman used the metal handcuffs to restrain A.N. for approximately 10 consecutive hours, with hardly any respite whatsoever, despite her extraordinary pleas for relief and the fact that she posed no threat to herself or others;

          d. A.N., according to Defendant Weiman's own report, was compliant, docile, and non-resistive when he responded to her residence, meaning that the application of metal handcuffs under the circumstances was altogether unnecessary and unreasonable, and especially during transport when A.N. was locked in the back of the patrol car and separated from Defendant Weiman by a metal partition.

79. Second, it was not objective reasonable for Defendant Weiman or Defendant Norton to apply and maintain a leg hobble against a severely disabled minor who lacks the ability to carry out basic activities of daily living, such eating, feeding herself, and using the bathroom, much less the ability to physically harm two adult law enforcement officers.

80. The acts or omissions of Defendant were the legal and proximate cause of Plaintiff's damages.

81. As a proximate cause and result of Defendants' unlawful conduct, Plaintiff has suffered actual physical bodily and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, great pain and emotional distress.

82. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

83. As a direct and proximate result of the acts, omissions, and violations alleged above, A.N. suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

84. In addition, Plaintiff is entitled to punitive damages against Defendants Weiman and Norton, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of A.N.

**SECOND CLAIM FOR RELIEF**
**Violations of Title II of the Americans with Disabilities Act**
(Plaintiff Against City of Broomfield)

85. Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth fully herein.

86. The ADA and its implementing regulations specifically prohibit discrimination in public services on the basis of disability. 42 U.S.C. § 12132 provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

87. The ADA defines a "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or local government, 42 U.S.C. § 12131(1). As noted above, the Broomfield Public Safety Department and Broomfield Police Department are departments within Broomfield. As a result, Broomfield is a "public entity" within the meaning of the ADA.

88. A.N. is a qualified individual with disabilities within the meaning of the ADA who has one or more physical and/or mental impairments that substantially limits one or more major life activities within the meaning of the ADA. *See* 42 U.S.C. § 12102(2)(A), as amended.

89. The Plaintiff met the essential eligibility requirements for the receipt of services or participation in the programs or activities provided by Broomfield at all times relevant to this matter. *See* 42 U.S.C. § 12131(2), as amended.

90. Broomfield excluded A.N. from participation in services, programs, and activities, and have denied her the rights and benefits afforded to other individuals who come into contact with officers of Broomfield, solely by reason of her disabilities in violation of the ADA. Moreover,

Broomfield has violated the ADA by intentionally failing or refusing to provide reasonable accommodations to the Plaintiff and other persons with severe disabilities.

91. Broomfield has willfully disregarded its duties under the ADA and has knowingly allowed unlawful policies and practices to persist related to the provision of services, programs, and activities to individuals with disabilities, and specifically with respect to the use of force against individuals with disabilities, including children.

92. Despite the long-standing and clear provisions of the ADA, Broomfield continues to enforce policies and practices that discriminate against A.N. and other persons with disabilities; therefore, an actual controversy exists between the parties entitling A.N. to declaratory relief pursuant to 28 U.S.C. § 2201.

93. Without the declaratory and injunctive relief requested herein, A.N., who resides in the City and County of Broomfield, is likely to encounter the same discriminatory policies and actual practices.

94. Without the declaratory and injunctive relief requested herein, Broomfield and its agents will continue to discriminate against A.N. on the basis of disability in violation of the ADA and its implementing regulations.

95. As a direct and proximate result of the acts, omissions, and violations alleged above, A.N. suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

**THIRD CLAIM FOR RELIEF**
**Violations of Section 504 of the Rehabilitation Act of 1973**
(Plaintiff Against City of Broomfield)

96. Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth fully herein.

97. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 7(20), shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial assistance . . . .

98. At all times relevant to this action, A.N. was a qualified individual with one or more disabilities within the meaning of Section 504.

99. A.N. was qualified to participate in the services, programs, activities, and benefits provided to other individuals who come into contact with officers from Broomfield within the meaning of Section 504.

100. At all times relevant to this action, the Broomfield received and benefitted from direct federal financial assistance.

101. Broomfield denied A.N. access to programs, benefits, and services provided to other individuals who come into contact with officers from the Broomfield, and for which she was qualified to participate, solely on the basis of her disabilities, thereby violating Section 504.

102. Specifically, and without limitation, Broomfield discriminated against A.N. by:

   a. ratifying and condoning the unnecessary use of force against a severely disabled minor who posed no threat to herself or others;

   b. maintaining a use of force policy which, in practice, does not accommodate individuals with disabilities or permit modifications as necessary to protect individuals with disabilities who pose no threat to law enforcement officers, the public, or themselves;

   c. failing to adequately train officers of Broomfield regarding the rights of individuals with disabilities with respect to the appropriate use of force; and

   d. failing to adequately supervise officers of Broomfield regarding interactions with individuals with disabilities with respect to the appropriate use of force.

103. Despite the clear provisions of Section 504, the Broomfield persisted in imposing policies and actual practices which discriminate against A.N. and other persons with severe disabilities who come into contact with law enforcement officers.

104. As a direct and proximate result of the acts, omissions, and violations alleged above, the A.N. suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical, and other expenses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor, on behalf of A.N., a minor, and against the Defendants, and award all relief as allowed by law and equity as appropriate, including, without limitation, the following:

e. Declaratory and injunctive relief;

f. Actual economic damages as established at trial;

g. Compensatory damages, including, without limitation, those for past and future pecuniary and non-pecuniary losses, pain and suffering, emotional distress, impairment of quality of life, reasonable and necessary medical and other expenses;

h. Issuance of an Order mandating appropriate equitable relief, including, without limitation, changes to the policies, procedures, and actual practices of Broomfield relative to individuals with disabilities, and specifically prohibiting the use of metal handcuffs and leg hobbles to restrain children with disabilities who are not resistive or combative;

i. Pre- and post-judgment interest at the highest lawful rate;

j. Attorneys' fees and costs associated with this action; and

      k. Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 9th day of December, 2019.

HIGHLANDS LAW FIRM

<u>*/s/ Zachary D. Warren*</u>
Zachary D. Warren

501 South Cherry Street
11th Floor
Denver, Colorado 80246
(720) 722-3880 (p)
(720) 815-3380 (f)
zwarren@highlandslawfirm.com

*Counsel for Plaintiff*
